GARY Y. LEUNG (Cal. Bar No. 302928)
Email:  leungg@sec.gov
MARISA WESTERVELT (Cal. Bar No. 217172)
Email:  westerveltm@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka Patel, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>DESILU STUDIOS, INC. AND CHARLES B. HENSLEY,<br><br>          Defendants, | Case No.<br><br>**COMPLAINT** |

COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.    Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.    Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant Charles B. Hensley resides in this district.

## SUMMARY

4.    This action involves an offering fraud orchestrated by Defendant Charles B. Hensley ("Hensley") and his entity, Desilu Studios, Inc. ("Desilu Studios"), through the offer and sale of Desilu Studios stock.  From June 2017 through at least July 2018, Hensley and Desilu Studios raised approximately $596,360 from at least 21 individual investors.

5.    Hensley falsely claimed to investors that he had obtained the rights to the Desilu brand, made famous by Desilu Productions, Inc. co-founders and spouses Desi Arnaz and Lucille Ball, and their long-running television show, "I Love Lucy." Hensley lured investors by claiming that he was reviving the Desilu brand through Desilu Studios, which purported to be a modern entertainment company engaged in

film and television production, merchandising, content streaming, theme parks, and cinemas.

5.     Desilu Studios claimed it was "on a fast track trajectory fueled by strategic acquisitions of revenue-generating assets" and would conduct its Initial Public Offering ("IPO") on the New York Stock Exchange "in the 4th quarter of 2018."  In reality, Defendants did little, if anything, to achieve these milestones.

6.     Contrary to Defendants' investment pitch, Desilu Studios never got off the ground as a working studio and did not use investor funds for business purposes. Instead, Hensley misappropriated investor funds for his personal use.

7.     By their conduct, Defendants Desilu Studios and Hensley violated the antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, and Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

8.     The SEC seeks findings that Defendants committed these violations; permanent injunctions; conduct-based injunctions; disgorgement with prejudgment interest from Defendants; civil monetary penalties against Defendants; and an officer and director bar as to Hensley.

## DEFENDANTS

9.     **Charles B. Hensley**, 68, resides in Torrance, California.  Hensley is the founder, chairman and chief executive officer of Desilu Studios and the founder and principal of its purported parent company, Desilu Corporation.  In 2011, Hensley pleaded guilty to a federal criminal charge for illegally marketing and selling VIRA 38, an unapproved herbal remedy that he claimed could prevent and treat bird flu, and, in 2012, he was sentenced to three years of probation.  *United States v. Charles B. Hensley*, CR No. 11-00455-JAK (C.D. Cal.).  In 2021, the Arizona Corporation Commission entered a cease-and-desist order against Hensley and his affiliated company Migranade, Inc., which purported to have an over-the-counter migraine remedy, and ordered Hensley to pay an administrative penalty and restitution to

investors for his involvement with a fraudulent securities offering for Migranade in 2017.  *In the Matter of Charles Hensley*, *et al.*, Docket No. S-21149A-21-0089 at Decision No. 78220 (Ariz. Corp. Commn. Apr. 23, 2021).  Hensley does not hold any securities licenses and has never been associated with an entity registered with the Commission.

10.     **Desilu Studios, Inc.** is a Delaware corporation with its principal place of business in Manhattan Beach, California.  Desilu Corporation, a Delaware corporation, is purportedly the parent company of Desilu Studios.  On May 6, 2019, the United States District Court for the Central District of California entered a default judgment and permanent injunction in the trademark infringement lawsuit *CBS Studios Inc. v. Desilu Studios, Inc., et al.*, Case No. 2:19-cv-09309, which permanently enjoined Desilu Studios from using the "Desilu" mark and ordered that Desilu Studios be dissolved or remove "Desilu" from its name.  Desilu Studios and its securities have never been registered with the Commission in any capacity.

## THE ALLEGATIONS

### A.     The Desilu Trademark

11.     In October 2016, Hensley filed an application to register the mark "Desilu" with the United States Patent Office ("USPTO").

12.     Hensley filed an October 28, 2016 declaration in connection with his USPTO application to register the "Desilu" mark, stating that he was entitled to use the mark in commerce on or in connection with the goods/services identified in the application – specifically, motion picture film production, television show production, and related services.

13.     Hensley submitted to the USPTO, on November 22, 2017, a "Statement of Use" purporting to show his use of the "Desilu" mark, which included links to a Desilu Studios website listing various film and television projects that Desilu Studios purportedly planned to release in 2018.

14.     Hensley did not disclose in his application to the USPTO that CBS

Studios, Inc. ("CBS") had been continuously using the "Desilu" mark for decades in its television programming.

15.     The USPTO approved Hensley's application for registration of the "Desilu" mark in January 2018, and issued a Certificate of Registration to Hensley.

16.     Hensley later claimed to have assigned his registered "Desilu" mark to Desilu Corporation, which in turn licensed it to Desilu Studios.

17.     In April 2018, Desilu Studios filed a lawsuit against CBS, which had a historical relationship with Desi Arnaz, Lucille Ball, and their company Desilu Productions, Inc., to establish its ownership and use of the "Desilu" mark.

18.     However, Desilu Studios voluntarily dismissed its lawsuit on October 21, 2018.

19.     Shortly thereafter, on October 30, 2018, CBS Studios filed its own lawsuit against Desilu Studios, Hensley, and related entity Desilu Corporation, alleging trademark infringement and other claims relating to the "Desilu" mark.  *CBS Studios*, *Inc. v. Desilu Studios*, *Inc.*, *et al.*, Case No. 2:18-cv-09309-AG-Ex (C.D. Cal.).

20.     The CBS lawsuit concluded in a May 2019 when this Court entered a default judgment that *inter alia* permanently enjoined Desilu Studios from using the "Desilu" mark and ordered that Desilu Studios be dissolved or remove "Desilu" from its name.

**B.     The Desilu Studios Offering**

21.     From about June 8, 2017 through at least July 16, 2018, Desilu Studios and Hensley raised approximately $596,360 from at least 21 individual investors.

22.     Hensley is the founder, chairman, and chief executive officer of Desliu Studios, and he had sole control over decisions concerning Desilu Studio's management, operation, and policies.  Hensley affixed his name to the Desilu Studios Private Placement Memorandums ("PPM") and thus on information and belief, Hensley had ultimate authority over the content of the PPM.

COMPLAINT                                        4

23.     The PPM offered shares of common stock of Desilu Studios from $5.00 to $10.00 per share depending on the date of the PPM.

24.     In the PPM, Desilu Studios claimed that it was "engaged in film, television, merchandising, content streaming, theme parks, and cinemas."

25.     In the PPM, Desilu Studios also claimed that it was "on a fast track trajectory fueled by strategic acquisitions of revenue-generating assets" and would conduct its Initial Public Offering ("IPO") on the New York Stock Exchange "in the 4th quarter of 2018."

26.     The "Executive Team" section of the PPM listed Hensley as chairman and chief executive officer of Desilu Studios, and falsely identified a former senior managing director at a large public company, who had been involved in a large studio acquisition, as chief operating officer and chief financial officer.

27.     Hensley personally solicited investments in Desilu Studios, in person and over the telephone.  Hensley targeted his own contacts as well the contacts of other individuals whom he knew, including unpaid interns working for Desilu Studios.  A number of investors, located in California, New Jersey, and Hawaii, had pre-existing personal relationships with Hensley or these other individuals.

28.     When soliciting investors, Hensley told them that his efforts to "reinvigorate" the Desilu brand had been "blessed" by Lucie Arnaz, the daughter of Desi Arnaz and Lucille Ball; that Desilu Studios had a value of $1 billion or more; and that the price of the Desilu Studios shares would increase and investors would be able to sell their shares for profit following the IPO.

29.     The PPM and attached subscription agreement instructed investors to send checks to Desilu Studios in Manhattan Beach, California, directed to the attention of "Dr. Charles B. Hensley, Chairman and Chief Executive Officer."  Wire transfers were to be sent to a Bank of America bank account in the name of Desilu Studios.  The address listed for Desilu Studios on this bank account was a residential

address in Redondo Beach, California, where Hensley appears to have been residing at the time.  Hensley was the signatory for this bank account.

### C.     Violations of the Antifraud Provisions

#### 1.     Misrepresentations concerning Desilu Studios

30.     Desilu Studios and Hensley misled investors into believing that Desilu Studios and Hensley owned the Desilu brand.

31.     The PPMs claimed that Hensley had "acquired" the Desilu brand in 2016.

32.     In fact, Hensley had merely filed an application to register a "Desilu" mark, which was not approved until January 2018 - and then only for the limited purpose of motion picture film production, television show production, and related services.

33.     Desilu Studios' subsequent trademark dispute with CBS Studios further demonstrates that Desilu Studios and Hensley never had a legitimate claim to owning the Desilu brand.

34.     Desilu Studios and Hensley also misled investors into believing that Desilu Studios had the support of the Arnaz family.  Hensley told investors that the actions he had taken with regard to Desilu Studios had been "blessed" by Lucie Arnaz.  These representations were false.

35.     Desilu Studios and Hensley also misled investors regarding the Desilu Studios executive team.

36.     In the "Executive Team" section of the PPM, Hensley's biography included as a relevant accomplishment Hensley's purported discovery and development of VIRA 38, but omitted to mention that Hensley had also been arrested, indicted, and pleaded guilty to a federal charge for introducing an unapproved new drug into interstate commerce for his activities relating to VIRA 38.

37.     In addition, the PPM falsely identified a former senior managing director at a large public company, who had been involved in a large studio acquisition, as

COMPLAINT                                        6

1   chief operating officer and chief financial officer.

2      38.   Desilu Studios and Hensley also misled investors into believing that

3   Desilu Studios was a billion-dollar, working film and television studio with active

4   film projects and other projects in the pipeline.

5      39.   The PPM stated that Desilu Studios had entered into business

6   acquisitions in furtherance of a multipronged business strategy mimicking that of

7   famous film and television studios, like Disney and Universal Studios, which are

8   known to operate other entertainment-related businesses, including digital streaming

9   services and theme parks.

10     40.   The PPM further stated that Desilu Studios had five "Company Profit

11  Centers" in: "Motion Pictures," "Television," "Merchandise," "Digital Streaming,"

12  "Theme Parks," and "Cinemas."

13     41.   In "Motion Pictures," for example, the PPM claimed that Desilu Studios

14  "will release a maximum of five feature films this year," and identified the theatrical

15  distribution partners for those films as Paramount Studios and Lionsgate, with video

16  streaming distribution through Netflix.

17     42.   In "Television," the PPM claimed among other things that Desilu

18  Studios "has a slate of television shows in various statges of development" that will

19  be distributed by Netflix as well.

20     43.   For "Merchandise," the PPM claimed that Desilu Studios employs "a

21  merchandising cycle revenue strategy for providing financing for its motion picture

22  and television properties" that uses revenue from sales of film and television-related

23  merchandise to underwrite Desilu Studio's development and production of motion

24  pictures and television series.

25     44.   In "Digital Streaming," the PPM claimed that Desilu was developing a

26  streaming platform that complemented its content business, and would drive

27  merchandising revenues, enable Desilu Studios to secure favorable licensing deals

28  with other content providers, incorporate in the future on-demand shopping into its

COMPLAINT                                    7

video streaming services, and partner with advertisers and other media agencies.

45.    Finally, in "Theme Parks," the PPM claimed that Desilu Studios was developing Desilu-branded theme parks, golf course homes, and vacation villas, in which Desilu Studios films and television shows would be the main attractions.

46.    Bank records for the Desilu Studios financial account referenced in the PPM, which received money from investors, and other bank accounts in the name of Desilu Studios, do not evince in any meaningful way any of the represented operations, business activities, or "Company Profit Centers" described above.

47.    Desilu Studios and Hensley also misled investors into believing that Desilu Studios would go public and the investors could then profit from their investment.  The PPM informed investors that "Desilu Studios will conduct its Initial Public Offering on the New York Stock Exchange in the 4th quarter of 2018."  The PPM also stated that "the company is on course for a highly successful public offering."  However, Desilu Studios never filed a Form S-1 with the Commission; nor did it take any other steps to go public.

### 2.    Misuse of investor funds

48.    Instead of using investor funds for Desilu Studios operations, Hensley misused investors' funds for his personal use.

49.    Specifically, Hensley used investor funds for multiple payments to the Wynn Resort in Las Vegas; and payments for Hensley's personal expenses, including payments to a gym, "club fees;" a dermatologist; a car title loan company; a pawn shop; personal entertainment; and payments for Hensley's wife and "family support."

50.    Desilu investors were not aware that investor funds would be used to pay for Hensley's personal expenditures.  Investors would have considered it important to their investment decisions to know that funds raised for Desilu Studios would be used by Hensley for his personal life.

### D.      Desilu Studios and Hensley's Misrepresentations were Material and Made with Scienter

51.      Defendants' false and misleading statements were material.  A reasonable investor would have considered it important to know that Desilu Studios did not actually own the Desilu brand from which it took its name.  Investors also would have wanted to know that Desilu Studios misrepresented the company's business operations, its valuation, identity of senior management, and its plans to go public.  In addition, a reasonable investor would have considered it important to know that investor funds would be used to pay Hensley's personal expenses.

52.      Defendants acted with scienter.  Defendants knew, or were reckless in not knowing, that investors' money was not being spent to facilitate the business of Desilu Studios as represented to investors.

53.      In addition, Defendants failed to exercise reasonable care by making material misrepresentations to investors concerning business operations and the use of investors' monies, and thus were negligent.

## FIRST CLAIM FOR RELIEF

### Fraud in Connection with the Purchase and Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (against all Defendants)

54.      The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

55.      In connection with the purchase or sale of securities, Defendants engaged in a scheme to defraud and made material misrepresentations to investors and omitted material information, including misrepresenting Desilu Studios' business operations and its use of investor funds.

56.      Because Hensley directly and indirectly controlled Desilu Studios, he is the maker of these material misrepresentations and omissions, along with Desilu Studios.

57.    By engaging in the conduct described above, Defendants, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

58.    Desliu Studios acted through Hensley.  Therefore, Hensley's knowledge, recklessness, and/or negligence may be imputed to Desilu Studios.

59.    Defendants, with scienter, employed devices, schemes, or artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities by the conduct described in detail above.

60.    By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a) of the Securities Act

### (against all Defendants)

61.    The SEC realleges and incorporates by reference paragraphs 1 through 88 above.

62.    In the offer or sale of securities, Defendants engaged in a scheme to

defraud and made several material misrepresentations to investors and omitted material information, including misrepresenting Desilu Studios' business operations and use of investor funds.

63.     By engaging in the conduct described above, Defendants, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

64.     Defendants, with scienter, employed devices, schemes, or artifices to defraud; and Defendants, with scienter or negligence, obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

65.     Desliu Studios acted through Hensley.  Therefore, Hensley's knowledge, recklessness, and/or negligence may be imputed to Desilu Studios.

66.     By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the

1 | alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Desilu Studios and Hensley, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] and Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

## III.

Issue an order permanently enjoining Hensley from directly or indirectly, including, but not limited to, through any entity owned or controlled by either or both of them, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer; provided, however, that such injunction shall not prevent Hensley from purchasing or selling securities for his own personal account.

## IV.

Issue an order against Hensley in accordance with Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting him from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

## V.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

## VI.

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)].

### VII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

### VIII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  August 10, 2022

*/s/ Gary Y. Leung*
Gary Y. Leung
Marisa Westervelt
Attorneys for Plaintiff
Securities and Exchange Commission